

C T J
ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 OCT -9  PM 12: 40

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| vs. § | CAUSE NO. <u>4:09-CR-0115-A</u> |
| § | |
| ROBIN BERTHELOT (12) § | |

## <u>GOVERNMENT'S ANSWER TO DEFENDANT BERTHELOT'S MOTION TO SUPPRESS</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the United States of America, by and through her Assistant United States Attorney, in her Government's Answer to Defendant **Robin Berthelot's** Motion to Suppress, and would respectfully show this Court as follows:

I.

On October 15 and October 20, 2008, officers at the Fort Worth, Texas, Drug Enforcement Administration Residence Office (FWRO) interviewed a confidential Source of Information [SOI#1] -who had been arrested for parole violations. In the interviews, SOI#1 identified Thomas L. Gerry as a large scale trafficker of methamphetamine. SOI#1 stated that SOI#1 had distributed methamphetamine for Gerry since 2007. SOI#1 said methamphetamine is delivered to Gerry at Gerry's residence 2116 San Fernando, Bedford, Texas, on a weekly or bi-weekly basis in 5 to 10 pound quantities. SOI#1 said that more and more transactions are conducted at the residence.

Based on the above and other information, members of the FWRO conducted surveillance at Gerry's residence at 2116 San Fernando, Bedford, Texas, prior to and on January 21, 2009. At approximately 3:34 P.M. on that date, a person officers recognized as Robert Leslie Bays[1] exited Gerry's residence, put something in the saddlebag on his motorcycle and departed the residence. Surveillance was maintained on Bays by FWRO personnel.

Officers contacted the Wise County Sheriff's Department and asked for assistance in stopping Bays on a traffic stop. Surveillance was maintained on Bays until he exited Hwy 287 at Hwy 114 in Wise County, Texas, where Wise County Sheriff Payne observed Bays proceed through the stop sign at that intersection without coming to a complete stop. Deputy Payne also observed other violations and stopped Bays for the traffic violations. Deputy Payne approached Bays and subsequently arrested him for no motor vehicle insurance, operating a motorcycle without a helmet and not meeting state guidelines to allow him to do so.

In a search of Bays' person after his arrest Deputy Payne found two large clear plastic baggies containing a large amount of suspected methamphetamine and another baggie containing suspected cocaine. The seized suspected drugs were analyzed at the Drug Enforcement Administration-South Central Laboratory, (DEA-SCL) and

---

[1] On two previous occasions, November 14, 2008 and December 8, 2008, Bays had been followed from Gerry's residence and found to be in possession of large quantities (in excess of 150 grams) of methamphetamine.

determined to be 222.9 grams of 34.2% pure methamphetamine hydrochloride and 4.4 grams of 71.9% pure cocaine hydrochloride.

In November 2008 agents of the Drug Enforcement Administration Fort Worth Resident Office (FWRO) interviewed a Confidential Source (CS#1) who earlier that month had, under the direction the agents, purchased 65.4 grams of 25% pure methamphetamine hydrochloride from John Holt and Thomas Gerry at Gerry's residence located at 2116 San Fernando, Bedford, Texas. During the course of the interview CS#1 had advised the investigating agents that one of the regular customers of Gerry and Holt was a tall blonde female whom CS#1 knew only as "Robin". CS#1 further said that "Robin" drove a black Toyota 4 Runner, was married to a doctor, and lived in Aledo, Texas. CS#1 was believed to be reliable because he had previously cooperated with a DEA investigation conducted by the Dallas Field Division and that his information had proven to be reliable and had led to the indictment, arrest, and conviction of several persons.

On December 16, 2008 surveillance was conducted on Gerry's residence. At approximately 6:27 p.m., a tall blonde female was observed coming out of the residence and entering a black Toyota 4 Runner, and then driving away from the residence, pulling a small trailer. The Toyota was found to be registered to Richard Schellin at 3904 Lost Creek Blvd., Aledo, Texas. The trailer was found to be registered to **Robin Berthelot** at that same address. Later that evening, a traffic stop was conducted on the Toyota 4

Runner for having a faulty trailer taillight. The driver of the vehicle was identified by her driver's license as **Robin Berthelot**. There was a passenger in the vehicle at the time of the stop who was identified as Mylinda Henderson. **Berthelot** was issued a warning, and allowed to leave. DEA officers and agents followed her from the scene of the stop to the residence at 3904 Lost Creek Blvd., Aledo, Texas. Subsequent investigation revealed that Richard Schellin was a licensed medical doctor who resided at 3904 Lost Creek Blvd., Aledo Texas.

On January 30, 2008 **Robin Berthelot** was again observed by DEA officers and agents leaving the Gerry residence. At the request of the DEA Tarrant County K-9 officer Weisman stopped **Berthelot** following her departure from Gerry's residence. Although Weisman's certified narcotic detecting dog alerted to the vehicle, no drugs were found by Weisman. DEA TFO Kevin Brown continued to follow **Berthelot** after the traffic stop. When Berthelot stopped her vehicle and went into a pawn shop Brown followed her inside. While in the pawn shop, Brown overheard **Berthelot** talking on her cellphone and telling some unknown person that she was fine, that the police didn't find "it" and that she still had "it". Brown justifiably concluded that **Berthelot** had, in fact, obtained drugs from Gerry's residence that day.

On February 27, 2009, officers of the FWRO were again conducting surveillance at Gerry's residence, where they observed **Berthelot's** Toyotta 4 Runner. As officers watched, **Berthelot's** vehicle left 2116 San Fernando, Bedford, Texas. Surveillance was

maintained on the vehicle until it arrived at the Waldemar Apartments, 4812 Waldemar Street, Haltom City, Texas, where TFO Kevin Brown observed **Berthelot** enter apartment #110, previously identified as the residence of Mylinda Henderson. Approximately one hour later, **Berthelot** and Henderson left in the black Toyota. Officers maintained surveillance on the black Toyota, and TFO Brown, with probable cause to believe that **Berthelot**, one of Gerry's methamphetamine dealers, now possessed methamphetamine, contacted with Officer Williams of the Haltom City Police Department. Brown, in an attempt to keep the federal investigation secret, requested Williams to stop the vehicle if he observed probable cause of a law violation.

As Officer Williams, in his marked patrol unit, was following the black Toyota it made an abrupt stop at 2220 Fincher Street, Haltom City, Texas, where **Berthelot** got out of the vehicle and approached a white female at the residence. After **Berthelot** talked with the female for about 30 seconds, she returned to her vehicle. The black Toyota then departed the residence, made a U-turn in the street, and started back toward the apartment complex.[2] Officer Williams got behind **Berthelot** again, from where he observed **Berthelot** fail to signal properly. Officer Williams initiated a traffic stop on the black Toyota at approximately 4:10 pm. Officer Williams arrested **Berthelot** for the traffic

---

[2]Officers recognized **Berthelot's** actions as "cleaning" herself, that is, attempting to identify and avoid being followed by law enforcement.

*United States v. Robin Berthelot*
No, 4:09-CR-0115-A (12)
Answer to Motion to Suppress

violation, and a search was conducted of the vehicle incident to the arrest.[3] Officer Williams found three plastic baggies containing a white crystal substance in the vehicle. The officer also found and seized five counterfeit $20.00 bills in **Berthelot's** wallet.

**Berthelot's** Black 2007 Toyota 4 Runner, TXLP# 909RSB, was "towed" to an impound lot, pursuant to Haltom City Police Department policy.

TFO Brown attempted to interview **Berthelot** following her arrest. **Berthelot** denied any knowledge of the drugs and invoked her right to counsel. TFO Brown immediately terminated the interview of **Berthelot**.

The contents of the three baggies were analyzed at the DEA-SCL which found that one baggie contained 50.0 grams of 95.2% pure methamphetamine hydrochloride, a second baggie contained 0.27 grams of 98.5% pure methamphetamine hydrochloride, and the third baggie contained 3.8 grams of 95.7% pure methamphetamine hydrochloride.

On August 19, 2009, a complaint was filed in this Court charging **Robin Berthelot** with Conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). **Berthelot** was arrested on the complaint at approximately 6:35 a.m. on August 20, 2009. After being advised of her rights, pursuant to *Miranda*, **Berthelot**

---

[3] Although Officer Williams was not aware of the full scope of the investigation of **Berthelot** and her co-conspirators, Task Force Officer Brown, who was directing the action, had probable cause to believe that drugs would be found in **Berthelot's** vehicle. That probable cause may be imputed to Officer Williams as "collective knowledge." *United States v. Ibarra*, 493 F.3d 526, 531 (5th Cir. 2007). Berthelot has not contested Officer Williams' probable cause to arrest her.

waived her right to remain silent, was interviewed by Task Force Officer Kennedy and made certain incriminating statements which she seeks to suppress here.

II.

On September 9, 2009, the defendant **Robin Berthelot** was indicted by a Federal Grand Jury with Conspiracy to Distribute and Possess with Intent to Distribute More than Five Hundred (500) grams of a Mixture or Substance Containing Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). **Berthelot** was arraigned on about September 16, 2009. On October 1, 2009, she filed her Motion to Suppress, alleging that her vehicle was illegally searched at the time of her February 27, 2009, arrest. **Berthelot** further alleges that any statements she made to officers after her arrest on August 20, 2009, pursuant to the warrant issued in this case, should also "be suppressed as being the fruits of an illegal search and seizure."

III.

"The Fourth Amendment provides that '[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .'" ***Bond v. United States*, 529 U.S. 334, 120 S. Ct. 1462, 1464, 146 L. Ed. 2d 365 (2000) (quoting U.S. CONST. amend. IV).** Under the Fourth Amendment, a warrantless arrest must be based on probable cause. ***United States v. Castro***, 166 F.3d 728, 733 (5th Cir.1999) (en banc). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient

for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *Id.* It is not even necessary for an arresting officer personally to know all of the facts which amount to probable cause, if there is some degree of communication between the arresting officer and an officer who does have knowledge of all the necessary facts. *United States v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir.1992).

IV.

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. *See United States v. Roch,* 5 F.3d 894, 897 (5th Cir. 1993); *United States v. De La Fuente,* 548 F.2d 528, 533 (5th Cir. 1977). There are situations, however, where the burden shifts to the government. *See: United States v. De La Fuente,* 548 F.2d at 533. When, as in this case, the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional. *See: United States v. De La Fuente,* 548 F.2d at 533. Therefore, in the instant case, since the officer conducted a stop without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the investigatory stop and search was constitutional.

V.

In this case, the defendant was driving a vehicle that was stopped when an officer observed that the vehicle failed properly to signal a turn.

TEX.TRANS.CODE ANN. § 545.104 (Vernon 1999), provides:

(a) An operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position.

(b) An operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn.

*Wehring v. State*, 276 S.W.3d 666, 668 (Tex.App.-Texarkana, 2008, no pet.).

A traffic stop constitutes a permissible *Terry* stop if the officer's action was justified at its inception and the detention was reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Jones*, 234 F.3d 234, 240 (5th Cir. 2000); *United States v. Zucco*, 71 F.3d 188, 190, 5th Cir. 1995).

**Berthelot's** vehicle was stopped by the Haltom City officer based on the officer's observation that the vehicle made an improper turn without legally using a turn signal. Therefore, the initial stop of the vehicle for traffic violations was justified at its inception. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993). **Berthelot** was then lawfully arrested for her traffic violation. See *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)(warrantless arrest for seatbelt violation lawful because officers may arrest for misdemeanors committed in their presence.) Officers searched **Berthelot's** person and her vehicle subsequent to her arrest, pursuant to the rule and practice in *New York v. Belton*, 453 U.S. *454* (1981), and *Thornton v. United States*, *541* U.S. 615 (2004), which had been widely read to permit

searching a vehicle incident to arrest even when the arrestee was handcuffed and secured in a police car. Subsequent to the search conducted in this case, on April 21, 2009, the Supreme Court decided *Arizona v. Gant*, ___ U.S. ___, 129 S. Ct. 1710 (2009), which announced new limits on searches of a vehicle incident to arrest of the vehicle's recent occupant.

## VI.

Prior to *Gant*, lower courts across the country routinely and virtually unanimously applied *Belton* to situations in which the recent occupant of a car was arrested, handcuffed, and placed in a squad car before his vehicle was searched.[4] The exclusionary rule should not apply to this search, conducted in good faith reliance on *Belton* and pre-*Gant* precedents authorizing such searches.[5]

The Supreme Court has recently reaffirmed that "suppression is not an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 129 S. Ct.

---

[4] See, e.g., *United States v. Mapp*, 476 F.3d 1012, 1015, 1017-1019 (D.C. Cir. 2007); *United States v. Wesley*, 293 F.3d 541, 545-549 & n.8 (D.C. Cir. 2002) (citing cases); *United States v. Doward*, 41 F.3d 789, 791 (1st Cir. 1994) (citing cases); *United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995); *United States v. White*, 871 F.2d 41, 44 (6th Cir. 1989); *United States v. Sholola*, 124 F.3d 803, 817-818 & n.15 (7th Cir. 1997) (citing cases); *United States v. Mitchell*, 82 F.3d 146, 152 (7th Cir. 1996); *United States v. Karlin*, 852 F.2d 968, 970-97 1 (7th Cir. 1988); *United States v. Hrasky*, 453 F.3d 1099, 1100, 1103 (8th Cir. 2006); *Conrod v. Davis*, 120 F.3d 92, 94 (8th Cir. 1997); *United States v. Weaver*, 433 F.3d 1104, 1107 (9th Cir. 2006); *United States v. Osife*, 398 F.3d 1143, 1144, 1146 (9th Cir. 2005); *United States v. Humphrey*, 208 F.3d 1190, 1202(10th Cir. 2000); see also 3 Wayne R. LaFave, Search and Seizure § 7.1(c) at 517 & n.89 (4th ed. 2004) ("[U]nder Belton a search of the vehicle is allowed * * * even after the defendant was removed from it, handcuffed, and placed in the squad car.") (citing cases).

[5] The *Gant* majority itself acknowledged the objective reasonableness of such searches. See *Gant*, 129 5. Ct. at 1723 n.h ("Because a broad reading of *Belton* has been widely accepted, the doctrine of qualified immunity will shield officers from liability for searches conducted in reasonable reliance on that understanding.")

695, 698 (2009). Rather, "the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Ibid.* In *Herring* and previous cases, the Court has carefully limited the exclusionary rule's application to situations where the deterrent purposes that it is designed to serve will be appreciably furthered and where the benefits of suppression outweigh its substantial social costs. *Id.* at 700-701; *United States v. Leon*, 468 U.S. 897, 910 (1984); *Illinois v. Krull*, 480 U.S. 340, *352-353* (1987); *Arizona v. Evans*, *514* U.S. 1, 10 (1995). Thus, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." **Herring**, 129 S. Ct. at 702.

Police conduct can only be sufficiently deliberate and culpable if "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." **Herring**, 129 S. Ct. at 701 (quoting Krull, 480 U.S. at 348-349). In **United States v. Peltier**, 422 U.S. 531 (1975), the Court held that the exclusionary rule would not apply to a roving patrol search conducted near the international border with neither a warrant nor probable cause because, at the time of the search, such searches had been previously authorized by statute, regulation, and judicial decisions from the relevant federal circuits. *Id.* at 539-542.

Even though a Supreme Court decision decided after the search had invalidated such searches, the Court found that the purposes of the exclusionary rule were not served

by deterring police officers from taking actions that were consistent with then-controlling law:

> Unless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional norm. If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

*Id.* at 542 (internal citations and footnote omitted); see also *Krull*, 480 U.S. at 350-351 (exclusionary rule does not apply to warrantless searches conducted in reasonable reliance on a statute authorizing the search, even though the statute was subsequently found to violate the Fourth Amendment).

## VII.

Even were the Court to determine that the stop was not supported by probable cause of a traffic violation, as set out above, the stop and subsequent search of the vehicle were fully supported based on probable cause to believe that **Berthelot** was in possession of drugs or evidence of the drug dealing conspiracy between her and others, including Gerry. "If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, ___ U.S. ___, 129 S.Ct. at 1721.

## VIII.

Even if the search of the defendant's vehicle had not been fully supported by her arrest for the traffic violation or by probable cause of her drug trafficking activities, the drug evidence would have inevitably been found pursuant to a routine inventory of her car which was being towed.[6] In ***United States v. Seals***, 987 F.2d 1102, 1108 (5th Cir. 1993), *cert. denied,* 510 U.S. 853 (1993), the court held that a rifle and crack cocaine found in the trunk of the appellant's car after the car had been stopped for a traffic violation would have inevitably been discovered during the normal police department inventory procedures and were admissible in evidence even if they were originally obtained improperly. In the case at hand, Officer Williams stopped **Berthelot's** car for making an illegal turn. After her arrest, Officer Williams had **Berthelot's** vehicle towed to the local impound lot. Prior to that, an inventory of the vehicle's contents would be performed, pursuant to Haltom City policy. The methamphetamine under the driver's seat of the vehicle would have been discovered at that time, pursuant to the routine inventory of the car.

In ***Nix v. Williams***, 467 U.S. 431 (1984), the United States Supreme Court adopted the inevitable discovery exception to the exclusionary rule which renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would have

---

[6] Certainly the **Berthelot's** vehicle would have been searched, with probable cause, after the counterfeit bills were found in her purse.

inevitably been discovered by lawful means. The evidence is admissible if prosecution shows by a preponderance of the evidence that such evidence would have been discovered even if the illegality had not occurred. *Id.* at 444. The prosecution is not required to prove the absence of bad faith in obtaining the information. *Id.* at 445. The Supreme Court found that evidence of the condition of the body of a murder victim, as well as related evidence, would have inevitably been discovered through a police-directed 200-party volunteer search that had already targeted the area where the body was found. Therefore, the evidence was admissible despite the body's having been discovered through statements made by the accused during an unlawful interrogation. *Id.* at 448-450.

Even before the Supreme Court's *Nix* decision, the Fifth Circuit had adopted the inevitable discovery doctrine. **United States v. Brookins**, 614 F.2d 1037, 1049 (5th Cir. 1980). In **Brookins**, the circuit court held that the prosecution had the burden of proving that when the illegality occurred, the police were "actively pursuing leads that would have lead to the challenged witness ...." *Id.* at 1048. In **United States v. Miller**, 666 F.2d 991 (5th Cir. 1982), this requirement was broadened. In **Miller**, an illegally seized diary led to the discovery of certain witnesses. **Miller**, 666 F.2d at 995. The defendant confessed eight days after the discovery of the diary and his statement contained the same incriminating evidence as the diary. The circuit court found that the defendant's confession was "an independent legal source for the disputed evidence." *Id.* at 997. The circuit court found that the investigators would have found the witnesses even without

access to the diary and thus, the evidence was admissible under the inevitable discovery doctrine. More recently, in *United States v. Seals*, 987 F.2d 1102,1108 (5th Cir. 1993), the circuit court held that a rifle and crack cocaine found in the trunk of the defendant's car after the car had been stopped for a traffic violation would have inevitably been discovered during the normal police department inventory procedures and were admissible in evidence even if they were originally obtained improperly.

In the case at hand, there was no improper or illegal conduct on the part of Officer Williams. He stopped **Berthelot** for legitimate traffic violation and, based on those infractions, he decided to arrest her. An inventory search of the automobile would have inevitably revealed all of the contraband substances Officer Williams located pursuant to the search incident to the arrest.

### IX.

Finally, the defendant claims that her statements to officers after her August 20, 2009, arrest on a warrant issued after a complaint was filed were the fruit of the unlawful stop. As set out above, the defendant's arrest for the traffic violation on February 27, 2009 was legal, and the contraband found in the subsequent search was properly the basis for her subsequent arrest.

However, even if the Court were to reject all the Government's reasoning and find that the evidence recovered in the warrantless search should be suppressed, it does not

automatically follow that evidence recovered after the defendant's August 20, 2009, arrest on a warrant should be suppressed as "fruit of the poisonous tree." *See **United States v. McClain**, 444 F.3d 556, 564-66 (6th Cir. 2005) ( Holding that the **Leon** exception bars application of the exclusionary rule where officers who sought and executed search warrants "acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." **United States v. McClain**, 444 F.3d at 566. See also **United States v. Fletcher**, 91 F.3d 48, 51-52 (8th Cir.1996) (Holding that an officer's initial detention of a bag in violation of the Fourth Amendment in order to subject it to a dog sniff did not bar application of the Leon exception to a warrant-authorized search of a bag) and **United States v. Thomas**, 757 F.2d 1359, 1368 (2d Cir.1985) (Holding **Leon** applicable to a warrant-authorized search of an apartment, because the affiant, acting in good faith and with no reason to believe that his actions were unconstitutional, disclosed all information to the magistrate even though the affidavit in support of the warrant contained information obtained in violation of the Fourth Amendment.).

Certainly, other courts have declined to accept "Good Faith" arguments seeking admission of evidence seized with a warrant, which was based on illegally obtained information or evidence. See **United States v. Davis**, 430 F.3d 345, 358 n. 4 (6th Cir.2005) ("[W]e agree with the numerous other circuits that have held that the Leon

good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure."); *United States v. Reilly*, 76 F.3d 1271, 1281-82 (2d Cir.1996) (holding **Leon** inapplicable in view of clear bad faith of officers who failed to disclose circumstances surrounding a dubious pre-warrant search in their warrant affidavit ); *United States v. Reilly,* 76 F.3d 1271, 1282 (2d Cir.1996) (collecting cases); *United States v. O'Neal*, 17 F.3d 239, 243 n. 6 (8th Cir.1994) (holding that "clearly illegal" method of seizure of evidence supporting the search warrant was not sanitized by issuance of a search warrant).

X.

WHEREFORE, Premises Considered, the Defendant Berthelot's Motion to Suppress should be, in all things, DENIED.

Respectfully submitted,

JAMES T. JACKS
UNITED STATES ATTORNEY

/s/ Frederick M. Schattman

/FREDERICK M. SCHATTMAN
Assistant United States Attorney
State Bar of Texas No. 17728400
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:   817.252.5200
Facsimile:    817.978.3094

## Certificate of Service

I hereby certify that a true and correct copy of the above pleading was served upon the defendant or his counsel of record in accordance with the provisions of Rule 49 of the Federal Rules of Criminal Procedure.

DATE: 9 October 2009

Frederick M. Schattman
Assistant United States Attorney